**SIGNED THIS: September 28, 2012**

_____
**Thomas L. Perkins**
**United States Chief Bankruptcy Judge**
_____

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **BRET M. BLUNDY,** | ) | Case No.  10-83658 |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| **KENNETH R. TURNBOW** | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No.  11-8019 |
| | ) | |
| **BRET M. BLUNDY,** | ) | |
| Defendant. | ) | |
| _____ | ) | |
| | ) | |
| **BRET M. BLUNDY,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No.  11-8070 |
| | ) | |
| **KENNETH R. TURNBOW,** | ) | |
| Defendant. | ) | |

## O P I N I O N

This matter is before the Court after the consolidated trial on the complaint filed by

the Debtor, Bret M. Blundy (DEBTOR), against Kenneth R. Turnbow (TURNBOW), for

violation of the automatic stay, and the complaint filed by TURNBOW against the DEBTOR

seeking a denial of the discharge pursuant to sections 727(a)(2) and (a)(4) and a

determination that the debt owed to him is nondischargeable pursuant to section

523(a)(2)(A).

## Background

The DEBTOR and TURNBOW were good friends.  In January, 2010, TURNBOW

made a loan which underlies this dispute, and the parties have since become adversaries.

The funds, made payable to the DEBTOR'S father, Roger Blundy, were used to purchase

a building at 711 N. 2nd Street, in Pekin, Illinois, where the DEBTOR operated a car

detailing business.  A handwritten document, dated January 30, 2010, and signed by the

DEBTOR and TURNBOW and "witnessed" by Roger, provides:

> I Brett Blundy agree to repay the amount of $18,400 to Kenneth R.
> Turnbow on or before 3/1/2015.
> I Kenneth Turnbow agree to reduce said debt by 10% of the monthly
> net profit of the GREAT BEAR store located at 711 N. 2nd St.
> Both parties agree to discuss and adjust this agreement on or before
> 6/1/2010.
> Mr. Blundy will pay a $100.00 minimum payment each month.  No
> interest is implied or expected.

The DEBTOR filed a Chapter 7 petition in bankruptcy on November 30, 2010,

scheduling TURNBOW as an unsecured creditor holding a claim in the amount of $18,400,

for a personal loan made in January, 2010.  The following questions and answers are

reflected on the DEBTOR'S Statement of Financial Affairs:

### 7.  Gifts

List all gifts or charitable contributions made within **one year** immediately
preceding the commencement of this case except ordinary and usual gifts to
family members aggregating less than $200 in value per individual family

member and charitable contributions aggregating less than $100 per recipient.

Answer - None.

**10.   Other transfers**

a. List all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within **two years** immediately preceding the commencement of this case. . . .

Answer - None.

TURNBOW received notice of the DEBTOR'S filing for bankruptcy, along with the other creditors. After the filing of the petition, the DEBTOR continued to operate his business at the premises purchased by his father. On March 17, 2011, TURNBOW timely filed a complaint seeking a determination that his debt be excepted from discharge and, alternatively, that the DEBTOR'S discharge be denied.

On August 3, 2011, the Chapter 7 Trustee filed an adversary complaint against the DEBTOR'S father, seeking to avoid a transfer by the DEBTOR in the amount of $18,400, as a fraudulent transfer under section 548(a)(1)(B) and its companion provision under Illinois law. The DEBTOR'S father failed to answer the complaint and a default judgment was entered. The TRUSTEE later compromised the matter for $13,500.[1] On September 7, 2011, the DEBTOR filed a complaint against TURNBOW alleging various violations of the automatic stay.

A trial was held on both matters on August 14, 2012. At the request of the parties, the trial was bifurcated, with the DEBTOR presenting first the evidence on the violation of

---

[1]TURNBOW does not contend that the outcome of that adversary proceeding has any collateral estoppel effect here. It does not.

the stay and then TURNBOW presenting evidence on the discharge/dischargeability action. Chad Hazelwood, a Pekin police officer, investigated a complaint of harassment and threats lodged by the DEBTOR against TURNBOW in May, 2011. Officer Hazelwood testified as to the content of text messages sent to the DEBTOR, which ranged from a string of obscenities, to "Give the truck back, b****," "Bust a cap," "Renwood Ave." "I'll give mom a kiss" and "Be seein' the peeps on Renwood." He testified that the Pekin Police Department was unable to determine who created the messages. A second Pekin police officer, Billie Engels, testified that she was present on June 8, 2011, when TURNBOW was arrested and placed in a squad car. Officer Engels testified that TURNBOW questioned whether he could be arrested for an offense that happened in North Carolina.

Roger, who lives on Renwood Drive in Peoria, testified that he purchased a building on Second Street in Pekin for his son to run his business and met TURNBOW when he rented him a portion of the building for his retail business. Roger testified that TURNBOW spent about one month fixing up the space. According to Roger's testimony, before business actually opened, TURNBOW called him to tell him he was moving out. During the month when TURNBOW occupied the premises, disputes arose concerning TURN-BOW'S occupancy of certain common areas of the building. Roger testified that TURNBOW failed to remove certain personal property, despite being given several opportunities to do so.

Roger recalled an incident in March, 2011, after the bankruptcy petition had been filed, when, driving home along Allen Road after working late, he encountered TURNBOW who appeared to be trying to ram his car. On another occasion, after parking

his vehicle in a space in the parking lot of a large retail store, TURNBOW pulled up behind him, blocking his exit.  Both times, when TURNBOW was satisfied that he had been recognized by Roger, he drove away without further incident.  Roger also testified that TURNBOW telephoned him on a half dozen occasions during that same time frame, expressing a greeting and advising him that he was not going to go away, expressing his wish that he would do the right thing and noting that it was almost Roger's "turn."  Other messages were disparaging of the DEBTOR.  Roger testified that on July 5, 2011, TURNBOW drove by his residence, announcing his presence by staring at Roger through the window and revving up his motorcycle.  Roger also testified that he had helped his son out financially at various times.  He has not received any payments since the bankruptcy.

The DEBTOR testified that, in addition to the unidentified text messages about which Officer Hazelwood testified, he had received several that he believed were made from TURNBOW'S cell phone around the same time.  One of the texts showed a picture of money, with the message that "it was never about the money until you locked me out." Others were innocuous, even friendly.  The DEBTOR regarded some as strange, leaving him baffled as to their meaning.  The DEBTOR testified that during a visit to North Carolina in May, 2011, he received two voicemail messages from TURNBOW, stating that he wanted the DEBTOR to know that TURNBOW'S relatives in that state "wanted to tell him hello."

According to the DEBTOR'S testimony, TURNBOW drove by the business premises about twenty times, honking his horn or shouting obscenities.  On approximately six of those times he would park across the street and take pictures, or walk by.  The DEBTOR

telephoned the police on one of those instances, and TURNBOW, having driven there in a truck with a trailer, was given the opportunity to remove his remaining property under police supervision.  TURNBOW declined, and the police officer arranged another time. TURNBOW telephoned the DEBTOR and canceled that arrangement.  The DEBTOR testified that TURNBOW drove by his house three or four times, once gesturing as if his hand were a gun and pointing it at the DEBTOR as he passed by.

TURNBOW testified that he was engaged in a business of selling handcrafted, Native American items.  TURNBOW testified that he had a written contract signed by the DEBTOR and his father, whereby he would provide the down payment for the purchase of the building in the amount of $18,400, in exchange for space in the building.  According to his testimony, keys to the business premises were given to other persons who would enter and leave the building at all hours, causing the alarm system to be disabled and leaving muddy footprints throughout the premises. TURNBOW testified that the DEBTOR and Roger offered to repay him the $18,400 if he would move out.  He began moving out, but when they were unable to come up with the money, they effectively evicted him by padlocking the door.

TURNBOW denied ever making any physical threats to the DEBTOR, or sending threatening text messages or leaving threatening voicemail messages. TURNBOW denied that he was in Illinois on June 12, 2011, the night referred to in a police report when TURNBOW had allegedly been across the street from the DEBTOR'S home, but was on his way back from Canada.  TURNBOW introduced into evidence a credit card statement showing charges made on that date which supported his testimony.  According to

TURNBOW, the police talked to his wife that night and she advised them that he was traveling. TURNBOW admitted that he had sent a text message to the DEBTOR while he was in North Carolina, because he had a friend there who had extra tickets to a speedway race, which he thought the DEBTOR might like to attend. TURNBOW described the vehicular incident on Allen Road as a chance encounter, stating that it was Roger who almost ran into him. TURNBOW denied ever driving by the DEBTOR'S house. TURNBOW explained the inquiry made to Officer Engels concerning North Carolina because he had no idea why he was being taken into custody.

With respect to the discharge/dischargeability action, the DEBTOR testified that he currently resides in North Carolina and is self-employed as a subcontractor in the remodeling business. The DEBTOR testified that he told TURNBOW that he needed a loan in order to make the down payment on the building on 2nd Street, which was being purchased by the DEBTOR'S father. The DEBTOR admitted that he borrowed $18,400 from TURNBOW, noting that the check issued by TURNBOW was made payable to his father. The DEBTOR discussed with TURNBOW that there would be additional space in the building which the DEBTOR would not need and that TURNBOW could work out arrangements with the DEBTOR'S father to occupy part of that space. The DEBTOR himself made no agreement with TURNBOW that he could occupy space in the building, but an agreement was made between the DEBTOR'S father and TURNBOW.

Admitting that no gifts were disclosed on the Statement of Affairs, the DEBTOR explained that he did not regard the payment made by TURNBOW for the down payment to be a transfer of funds by him to his father, because the check was written directly to his

father. The DEBTOR was uncertain whether he owed any money to his father when the petition was filed. The DEBTOR stated that he believed his schedules to be accurate. The DEBTOR stated that he operated his business, Auto Accents, as a sole proprietorship. At the time he filed bankruptcy, he estimated that his tools were worth $1,500. Questioned regarding the depreciation taken on his 2010 income tax return, the DEBTOR identified an item as a large metal toolbox, which was purchased in January, 2008, for $10,541. DEBTOR stated that he did not actually own the toolbox, but that it was financed through Matco Tools.[2] The depreciation schedule also listed a car lift purchased in November, 2008, for $4,097. The DEBTOR testified that he still had the tool box and his tools, but that the car lift, bolted to the wall and floor, remained at the building on 2nd Street, because he could not remove it without damaging the building.[3]

The DEBTOR testified that he had had business relationships with several auto dealerships. The dealerships paid him on a monthly basis, generally after the 10th of each month. DEBTOR did not recall if, at the time of filing, he was owed any money for work which he had performed prior to the filing of the petition. TURNBOW presented no evidence of any undisclosed receivables.

Admitting the possibility that he could have transferred a vehicle within the two years prior to bankruptcy, the DEBTOR could not, at first, recall any specific transfer within that time frame. The DEBTOR admitted that he transferred to his ex-girlfriend a 1997 Cadillac Deville valued at $2,500, to apply toward a child support arrearage. At the time

---

[2]Matco Tools is listed on Schedule F as an unsecured creditor holding a claim for $9,355, for the purchase of "merchandise." Who actually held title to the tool box was not clarified.

[3]The DEBTOR testified that he had once obtained an estimate in the amount of $1,200 for removal of the car lift.

8

of the transfer, the car had a blown transmission and could not be driven.  In 2009, the

DEBTOR gave a 1999 Dodge Dakota to TURNBOW, because he needed a truck to pull his

trailer.  No consideration was given for the transfer.  The DEBTOR sold a 1996 GMC Sierra

in 2010 to an auto dealer in Pekin for $500.  At the time, the Sierra was inoperable.  The

DEBTOR also owned a 1989 Chevrolet Blazer which he traded to an employee in payment

of wages.  The DEBTOR testified that these vehicles were "back row" vehicles, meaning

they were of very low value.  He stated that his omission of the transfers of the vehicles

from the Statement of Affairs was unintentional.

**DENIAL OF DISCHARGE**

Denying a debtor a discharge is regarded as a harsh and drastic remedy.  *In re*

*Charles,* 474 B.R. 680, 683 (8th Cir.BAP 2012); *In re Sever*, 438 B.R. 612 (Bankr.C.D.Ill. 2010).

Exceptions to discharge must be construed liberally in favor of the debtor and strictly

against the objecting creditor in order to effectuate the fresh start policy of the bankruptcy

laws.  *Matter of Juzwiak*, 89 F.3d 424 (7th Cir. 1996).  In exchange for that fresh start, the

Bankruptcy Code requires debtors to accurately and truthfully present themselves before

the court, in order to assist the trustee in the administration of the estate and to provide

adequate information to creditors.  *In re Olbur*, 314 B.R. 732 (Bankr.N.D.Ill. 2004).  A trustee

or creditor seeking to deny a debtor a discharge bears the burden of proving each of the

elements of the claim by a preponderance of the evidence.  *In re Scott*, 172 F.3d 959 (7th Cir.

1999).

**Section 727(a)(2)**

Section 727(a)(2)(A) provides that a court shall grant a debtor a discharge unless "the

debtor, with the intent to hinder, delay or defraud a creditor . . . has transferred, removed,

destroyed, mutilated, or concealed . . . property of the debtor, within one year before the date of the filing of the petition." 11 U.S.C. § 727(a)(2)(A).  In order to prevail under this provision, the objector must prove by a preponderance of the evidence that the debtor (1) transferred, removed, destroyed or concealed; (2) the debtor's property; (3) with actual intent to hinder, delay, or defraud a creditor; (4) within one year of bankruptcy.  *In re Kontrick*, 295 F.3d 724 (7th Cir. 2002).  In essence, the exception consists of two components: an act, i.e., a transfer or a concealment of property of the debtor, and an improper intent, i.e., a subjective intent to hinder, delay or defraud a creditor, by the act of transferring the property.  *Id*.  Because direct evidence of a fraudulent intent is usually unavailable, fraudulent intent may be inferred from the debtor's actions and may be inferred from circumstantial evidence of a course of action.  *Matter of Yonikus*, 974 F.2d 901 (7th Cir. 1992).  Neither of the elements was established by TURNBOW at trial.

To establish grounds for denying the DEBTOR'S discharge under section 727(a)(2)(A), TURNBOW must first establish that the property transferred belonged to the DEBTOR.  TURNBOW has failed to establish this threshold element.  The term "property of the debtor," as used in this exception to discharge, refers to "property in which the debtor has a *direct* proprietary interest."  *In re Wagner*, 305 B.R. 472, 475 (8th Cir.BAP 2004).  The exception has no application when the property transferred belongs to someone other than the debtor.  *In re Spitko*, 357 B.R. 272 (Bankr.E.D.Pa. 2006).  This claim concerns the nondisclosure of the transfer of $18,400 and the back row cars.

The Court heard the testimony of the DEBTOR, the DEBTOR'S father and TURNBOW, the three parties to the agreement.  That testimony was consistent and was not

controverted in any way.  Although TURNBOW was first approached by the DEBTOR, who inquired if TURNBOW would be willing to make a loan to be used for the down payment on a building, TURNBOW made the loan to the DEBTOR'S father, who purchased the building, taking title in his name.  TURNBOW'S check was payable to Roger.  There is no evidence that Roger's purchase of the building was a sham or that the DEBTOR held any secret beneficial interest in the building on 2nd Street.  Undeniably, the DEBTOR agreed to repay the loan.  Just what the arrangement was between the DEBTOR and Roger regarding the DEBTOR'S occupancy of the building was not explored at trial.  The fact remains, however, that the DEBTOR never had possession, ownership or control over the proceeds of the loan.[4]  That the DEBTOR agreed to be personally responsible for repayment of the loan to TURNBOW is properly viewed as an accommodation to his father, probably pursuant to an agreement or understanding between them concerning the DEBTOR'S occupancy of the building.  The bottom line is that the loan enabled Roger, not the DEBTOR, to acquire title to the real estate, directly benefitting him, and only indirectly benefitting the DEBTOR.

Assuming for the sake of argument that the funds loaned by TURNBOW involved a transfer of property of the DEBTOR for purposes of this exception, there was no evidence that the DEBTOR intended to defraud creditors.  The DEBTOR needed a place to run his business and his father was apparently willing to purchase a building if the DEBTOR could

---

[4]The determination that there was not an actual transfer of property belonging to the DEBTOR, means that there was no reduction in assets available to creditors as a result of TURNBOW'S loan.  The compromise between the TRUSTEE and Roger, however, netted roughly $8,800 for distribution to the DEBTOR'S creditors.  According to the Final Report filed by the TRUSTEE, all of the available funds went to pay costs of administration and priority claims.  Both the IRS and the Illinois Department of Revenue received pro rata distributions on their claims.  No distribution was made to unsecured creditors.

come up with the down payment.  TURNBOW, needing retail space, was willing to loan

the funds to Roger, in exchange for space in the building.  There is nothing in the evidence

to indicate that the DEBTOR, at the time the loan was made, was engaged in a scheme to

cheat or defraud TURNBOW or any other creditors.  The DEBTOR'S testimony that he did

not consider the funds to have been his property is consistent with the circumstances of the

tripartite business arrangement.  The Court considers the DEBTOR'S viewpoint to have

been held honestly and in good faith.[5]  The nondisclosure was not fraudulent.

**Section 727(a)(4)(A)**

Section 727(a)(4)(A) provides:

(a) The court shall grant the debtor a discharge, unless–
* * *
(4) the debtor knowingly and fraudulently, in or in connection
with the case–
(A) made a false oath or account....

11 U.S.C. § 727(a)(4)(A).  In order to prevail, the objector must establish by a preponderance

of the evidence that (1) the debtor made a statement under oath; (2) the statement was false;

(3) the debtor knew the statement was false; (4) the debtor made the statement with

fraudulent intent; and (5) the statement related materially to the bankruptcy case.  *In re*

*Sholdra*, 249 F.3d 380 (5th Cir. 2001).  A debtor's petition, schedules, statement of financial

affairs, and statements made at a first meeting, all constitute statements made under oath

for purposes of section 727(a)(4).  *In re Bostrom*, 286 B.R. 352 (Bankr.N.D.Ill. 2002).  A false

oath may include a knowing and fraudulent omission.  *In re Handel*, 266 B.R. 585

(Bankr.S.D.N.Y. 2001).

---

[5]It is not necessary for the Court to decide definitively whether the DEBTOR ever acquired a property interest in the
funds under Illinois law.  It is enough that the facts support a contrary conclusion, given that the DEBTOR never had
possession or control of the funds, and that his position was held honestly and in good faith.  There is no evidence that
he altered his position merely for purposes of this litigation.

Not every error or omission in the bankruptcy schedules or statement of financial affairs results in denial of a discharge.   Courts recognize that innocent mistakes and inadvertent errors occur.  *In re Keeney*, 227 F.3d 679 (6th Cir. 2000).  To justify denial of discharge under this provision, the oath must have been knowingly and fraudulently made.  *In re Campbell*, 475 B.R. 622 (Bankr.N.D.Ill. 2012).  In addition, the false statement must have been made with a fraudulent intent.  Such intent to defraud may be based on a reckless disregard, but it will not be found where the omission is the result of inadvertence or carelessness.  *In re Gardner*, 384 B.R. 654 (Bankr.S.D.N.Y. 2008).  In addition, an omission must relate materially to the bankruptcy case.  *Matter of Agnew*, 818 F.2d 1284 (7th Cir. 1987).  The subject matter of a false oath is "material" if it bears a relationship to the debtor's business transactions or estate or could lead to discovery of assets or the existence and disposition of debtor's property.  *Stamat v. Neary*, 635 F.3d 974 (7th Cir. 2011).  A false statement or omission that has no impact on a bankruptcy case is not material.  *In re Khalil*, 379 B.R. 163, 172 (9th Cir.BAP 2007).  An omission of an asset of insignificant value may be immaterial.  *In re Bailey*, 147 B.R. 157 (Bankr.N.D.Ill. 1992).  Courts faced with a claim under section 727(a)(4) occasionally must deal with a particularly aggressive creditor who examines the debtor's schedules with a microscope and a pair of tweezers.[6]  *See In re Sharp*, 244 B.R. 889, 894 (Bankr.E.D.Mich. 2000).  In such situations, courts apply a common sense, real world standard to whether omissions are material and fraudulent.

TURNBOW asserts that the DEBTOR made several false oaths in connection with the filing of his bankruptcy petition.  First, TURNBOW contends that the DEBTOR failed

---

[6]A material omission allegation raised by the case trustee or the United States Trustee, whose sole interest is to uphold the integrity of the bankruptcy system, is one thing.  The same allegation brought by a creditor, particularly when alleged in the alternative to other claims of nondischargeability and/or discharge denial, is another.

to disclose the transfer of the loan proceeds he received to his father.  Next, he contends that the DEBTOR failed to disclose income or receivables to which he was entitled. TURNBOW also contends that the DEBTOR failed to disclose that he transferred three vehicles within the year preceding the bankruptcy.  Finally, TURNBOW contends that the DEBTOR failed to disclose certain business assets on his bankruptcy schedules.

Like TURNBOW'S claim under the prior exception to discharge, his claim under section 727(a)(4) fails in several respects.  For the reasons previously stated, the loan proceeds, paid by TURNBOW directly to Roger, likely never became property of the DEBTOR.  TURNBOW'S argument that he was obliged to disclose that transfer on his Statement of Financial Affairs must be rejected.

While a debtor's omission of earned income on his bankruptcy schedules may constitute a false oath or account, TURNBOW failed to establish that the DEBTOR was entitled to receive commissions on the date of the petition which he had earned prior to the filing.  The DEBTOR denied it and his testimony was credible.

The Court finds that TURNBOW has established the first two elements with respect to the omission of the transfer of certain vehicles on the Statement of Financial Affairs, as those were all owned by the DEBTOR.  TURNBOW has failed, however, to establish the remaining elements of his claim: that the omissions were intentional, were made with fraudulent intent, were material, and that omitted transfers were made within two years of the petition date.

It is apparent from the DEBTOR'S testimony that he dabbled in car flipping.  He would occasionally purchase a "back row" – meaning older and in poor condition – car

14

from a used car dealer in the hope of fixing it up and reselling it for a profit.  There was no evidence that he ever made any money at this sideline venture.   The evidence is uncontroverted that the cars in question were junkers that were worth very little. TURNBOW made no effort to attempt to prove that any of the vehicles had substantial value.  The Court credits the DEBTOR'S testimony that because of the minimal value of the vehicles, the disclosure of the transfers was overlooked.   In addition, the DEBTOR'S memory of when the transfers occurred was less than clear.  No independent evidence of the dates of transfer was introduced.  TURNBOW failed to prove that the nondisclosure was fraudulent and material.

TURNBOW alleges that the DEBTOR fraudulently omitted from his schedule of personal property, a valuable tool box and car lift.  On his schedule of personal property, the DEBTOR scheduled "Tools" valued at $1,500.  On his 2010 federal income tax return, prepared as of September 14, 2011, the tax preparer attached an Asset Summary Worksheet listing ten depreciable assets.  Included on the worksheet are the following tools:

| Item | Asset Cost | Depreciated Value |
|------|-----------|-------------------|
| Tool Chest | $   776 | Unknown |
| Carpet Extractor | 1,799 | $1,546 |
| LG Metal Tool | 10,541 | 6,116 |
| Air Compressor | 1,178 | 684 |
|  | $14,294 | @ $8,346 |

The DEBTOR testified that he purchased certain tools from Matco Tools, including the LG Metal Tool Box, that he financed the purchase with Matco, and that he still owed on the tools when he filed his petition.  He scheduled Matco Tools as being owed $9,355 for merchandise purchased.  This sum is close to the depreciated value of the tools listed on the Asset Summary Worksheet.

The Chapter 7 Trustee abandoned scheduled assets, including the tools, as having no value for the estate. The DEBTOR'S testimony about the tools was credible and unimpeached. The Court finds as a matter of fact that Matco had a purchase money lien on the tools, the amount of which exceeded or was approximately equal to the value of the tools. While the general disclosure on Schedule B could have easily been clarified by listing the individual items with corresponding values, the bottom line is that the ambiguous description and understated value amount were not material as there was no equity in the tools for the estate.[7]

The DEBTOR also testified that he had purchased a hydraulic car lift for $4,097 that was affixed to the building in such a way that it could not be removed without damaging the building. Arguably, it thus became a fixture, or part of the real estate owned by Roger. The DEBTOR testified that he left it affixed as it was when he moved to North Carolina and has no intention of trying to remove it. It is not clear from the evidence whether the DEBTOR financed the purchase of the lift with the seller or another financier. No competent evidence of the value of the lift, or if it could be removed and sold, was presented. Presumably, the Chapter 7 Trustee did not view it as having any value for the estate. The Court is not persuaded that the DEBTOR omitted the lift with an intent to defraud or that the omission was material.

Neither is the Court persuaded that the several omissions in the aggregate are so egregious as to justify denial of the discharge. *See In re Sever, supra.* Although there is

---

[7]The Court is not privy to the DEBTOR'S testimony at his 341 hearing. The Court believes that chapter 7 trustees confronted with a vague asset description such as "tools," would routinely ask the debtor for more specific information, particularly where a debtor is employed in an auto-related business where substantial tools would be regularly utilized. TURNBOW makes no claim that the DEBTOR lied at the first meeting.

evidence in the record from which inferences could be drawn that the DEBTOR acted with

a fraudulent intent or recklessly, after carefully observing and listening to the testimony,

the Court determines that the evidence supporting denial of discharge is less than a

preponderance of all the evidence.

**Dischargeability:  Section 523(a)(2)(A)**

Section 523(a)(2)(A) of the Bankruptcy Code excepts from discharge "any debt – for

money, property, [or] services. . . to the extent obtained, by – false pretenses, false

representation, or actual fraud. . . ." 11 U.S.C. section 523(a)(2)(A).  A false representation

is an express misrepresentation.  False pretenses includes implied misrepresentations or

conduct intended to create and foster a false impression.  Actual fraud is not limited to

misrepresentations and misleading omissions, but encompasses "any deceit, artifice, trick,

or design involving direct and active operation of the mind, used to circumvent and cheat

another." *McClellan v. Cantrell*, 217 F.3d 890  (7th Cir. 2000).  To prevail on a claim for "false

pretenses" or "false representation," a creditor must establish the following elements: (1)

the debtor obtained money, property, or credit through representations that the debtor

knew to be false or that were made with reckless disregard for the truth; (2) the debtor

made the misrepresentations with the intent to deceive; and (3) the creditor justifiably

relied on the misrepresentation.  *Mayer v. Spanel Intern. Ltd.*, 51 F.3d 670 (7th Cir. 1995).

In order to establish a claim for actual fraud, a creditor must establish (1) a fraud occurred;

(2) the debtor intended to defraud the creditor; and (3) the fraud created the debt that is the

subject of the nondischargeability action. *McClellan*, 217 F.3d at 893.  A debt is not rendered

nondischargeable by a failure to perform a promised act, unless the debtor had no intention

to perform at the time the promise was made. The burden is on the creditor to prove all of the elements by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

A necessary element under each prong of section 523(a)(2)(A) is proof of the debtor's intent to deceive. *In re Hanson*, 432 B.R. 758 (Bankr.N.D.Ill. 2010). A debtor's intent to defraud is measured by a subjective standard and is ascertained by the totality of the circumstances of the case. *In re Kucera*, 373 B.R. 878 (Bankr.C.D.Ill. 2007). The focus is upon the manner in which the debtor "obtained" the funds. *In re Graham*, 472 B.R. 524 (Bankr.W.D.Wis. 2012). Subsequent conduct is only relevant to the extent that it reflects the debtor's state of mind at the time the funds were obtained. *In re Copeland*, 291 B.R. 740 (Bankr.E.D.Tenn. 2003).

TURNBOW fares no better in his attempt to have his debt determined to be nondischargeable. As the court noted in *In re Freese*, 472 B.R. 907 (Bankr.D.N.D. 2012), a creditor, as a threshold showing, must establish that the "[d]ebtor fraudulently obtained something from [the creditor], not simply that [the debtor] engaged in fraud that results in a debt owed to [the creditor.]" Clarifying that statement, the court stated that it is the debtor himself who must have obtained money or property and that "obtaining" money or property means only "the direct transfer of money from a creditor to the debtor." Here, as determined, no funds were obtained by the DEBTOR.

Moreover, TURNBOW does not specify the false or fraudulent representations which the DEBTOR allegedly made. The DEBTOR'S undisputed and credible testimony was that he requested a loan from TURNBOW for a down payment on the purchase of a

18

building by his father to be used for his business.  It is clear from the testimony that the agreement between TURNBOW and the DEBTOR included the DEBTOR'S father and that it contemplated that the building would be purchased by the DEBTOR'S father. TURNBOW was fully aware of Roger's interest and made the check payable to Roger. There is no evidence supporting TURNBOW'S assertion that the DEBTOR misrepresented his intentions or the purpose to which the funds would be put.  There is no evidence of an actual intent to deceive, or circumstantial evidence in support of such a conclusion.

**Violation of the Automatic Stay: Section 362**

The automatic stay provision is one of the fundamental debtor protections in the Bankruptcy Code.  It prohibits "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the [bankruptcy case]." 11 U.S.C. § 362(a)(6). Section 362(k) provides that an individual injured by a willful violation of the automatic stay "shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."   To be willful, a creditor must take deliberate action with the knowledge that a petition in bankruptcy has been filed.  *In re Stewart*, 190 B.R. 846, 850 (Bankr.C.D.Ill. 1996).   A willful violation does not require a specific intent to violate the automatic stay.  *In re Radcliffe*, 563 F.3d 627 (7th Cir. 2009).

Every postpetition contact from or communication by a creditor is not actionable *per se* under section 362(k).  Harassment does not violate the stay simply because it is directed toward a debtor by a creditor.  A violation occurs only where the harassment is aimed at collecting a prepetition debt.  *In re Protos,* 2005 WL 6491916 (Bankr.N.D.Ga. 2005); *In re Mercier,* 328 B.R. 590 (Bankr.M.D.Fla. 2005).

In his complaint, the DEBTOR alleged that TURNBOW violated the automatic stay by continuously harassing him by sending text and email messages, leaving voicemail messages and by stalking him on numerous occasions in May and June, 2011. The DEBTOR alleged that TURNBOW made threats against him and also left threatening telephone messages with his parents. The DEBTOR sought attorney fees and damages. After trial, the DEBTOR narrowed his request, admitting that he suffered very little in actual damages. TURNBOW denied these incidents, admitting only that he left a voicemail message on the DEBTOR'S phone while he was in North Carolina to advise the DEBTOR about the availability of race tickets. The conflicting evidence introduced at trial regarding the alleged violations of the automatic stay is difficult to square. The DEBTOR admitted that a number of the text messages sent to his phone could not be tied for sure to TURNBOW, and the police were unable to do so. TURNBOW asserts that the emails he did send to the DEBTOR and the voicemail messages left on his phone concerning North Carolina were not sent for the purpose of coercing the DEBTOR into payment of the loan, but were attempts to reestablish their friendship.

The communications are ambiguous at best. Either version of events is plausible. The truth is likely somewhere in the middle. In the end, the Court determines that the DEBTOR has failed to carry the preponderance of the evidence standard. The relief will be denied.

Neither party came across as particularly sympathetic. TURNBOW accepted the risk of making a large loan in a very casual fashion, with no collateral and no contract with Roger. The reasons why TURNBOW abandoned his plan to open a retail shop in Roger's

building were unexplained.  His alleged subsequent actions appear to have been directed largely at Roger rather than the DEBTOR.  The DEBTOR also conducted his business relationship with TURNBOW in a loose and ambiguous fashion, opening the door to a misunderstanding that terminated a long-standing friendship.  Denial of all relief allows this personal dispute to be put to bed once and for all so that the parties may move on.

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.  Separate Orders will be entered.

###